**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUSTIN COSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  23 C 2236 |
| | ) | |
| CHICAGO POLICE OFFICER GABRIEL | ) | Judge Rebecca R. Pallmeyer |
| RODRIQUEZ (#12737), SUPERINDENDENT | ) | |
| DAVID BROWN, and CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Justin Cosby participated in a Black Lives Matter ("BLM") protest in downtown Chicago on May 30, 2020.  When he saw Chicago police officers spraying a chemical agent at BLM protestors, Cosby responded by spraying the officers with a toy water gun, and was arrested. In this lawsuit, Cosby sues Chicago Police Officer Gabriel Rodriguez, former Chicago Police Superintendent David Brown, and the City of Chicago, alleging violations of federal and state law relating to the arrest, the alleged use of excessive force, and a prolonged detention.  Defendants have moved to dismiss Plaintiff's Second Amended Complaint, and for reasons explained here, the motions are granted in part and denied in part.

The standards that govern these motions are familiar.  A complaint may be dismissed under Rule 12(b)(6) if it fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007).  A claim is plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)).  The complaint need not "recite every detail related to [Plaintiff's] allegations," but must instead simply "include enough facts to present 'a story that holds together.'" *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022) (quoting *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)).  In determining whether

this test is met, the court will "accept as true all factual allegations in the complaint and draw all permissible inferences in plaintiff['s] favor." *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020).  Finally, a plaintiff can also "plead himself out of court by pleading facts that show he has no legal claim," *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016), including by pleading "all the ingredients of an impenetrable defense."  *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

## BACKGROUND

This case began in November 2020, when some sixty BLM protesters filed an omnibus complaint alleging various forms of police abuse during six days of demonstrations in the spring and summer of 2020.  (*See* Exec. Committee Ord. [1]; Compl., Protesters in Supp. of Black Lives et al. v. City of Chicago et al., No. 20-cv-06851 (N.D. Ill. Nov. 19, 2020), ECF No. 1; Joint Mot. to Sever Pursuant to Rule 20(a) Certain Allegations and Plaintiffs in Plaintiffs' Fourth Am. Compl. (hereinafter "Motion to Sever"), Protesters in Supp. of Black Lives et al. v. City of Chicago et al., No. 20-cv-06851 (N.D. Ill. Sept. 1, 2022), ECF No. 127.)  After four amendments—amendments primarily "naming . . . new parties" and "identifying new Defendant officers"—the complaint included sixty-six plaintiffs and listed, as defendants, sixty-two named officers, and some one hundred unnamed officers.  In April 2023, the court's Executive Committee granted the parties' joint motion to sever the individual plaintiffs' claims, and Mr. Cosby's case was reassigned here. (Motion to Sever at 1; Exec. Committee Ord.)

On April 28, Mr. Cosby filed an amended complaint limited to his own claims.  (Am. Compl. [14]; *see also* Minute Entry [4].).  His amended complaint charted police abuses that occurred as early as the 1800s; Defendants City of Chicago and David Brown (the "City Defendants") moved to strike several paragraphs of the complaint as immaterial and prejudicial.  (Def.'s Joint Mot. to Strike Certain Paragraphs from Pl.'s Am. Compl. [21] at 5–6.)  The court granted that motion [32], and Mr. Cosby filed his Second Amended Complaint on July 12, 2023 (*see* SAC).  The court's recitation of the facts assumes the truth of the allegations in that Complaint.

## I.    Factual Background

Plaintiff Cosby situates his case in the context of the Chicago Police Department (CPD)'s response to widespread protests against "anti-Black racism, white supremacy, police violence, and mass criminalization and incarceration" that welled up in Chicago—and across the country— during the summer of 2020.  (Second Am. Compl. (hereinafter "SAC") [34] ¶¶ 1, 3.)  The protests, sparked by George Floyd's murder by Minneapolis police officers on May 25, 2020, caused "massive demonstrations" in the downtown area beginning on May 29 and spanning the summer months.  (*Id.* ¶¶ 18, 39.)

### A.    Mr. Cosby's Injuries

Mr. Cosby, a nineteen-year-old Black Chicago resident, participated in one of those first BLM protests in downtown Chicago on May 30, 2020.  (*Id.* ¶ 12.)  While there, near the intersection of Grand Avenue and Clark Street, Mr. Cosby "observed multiple unidentified Chicago police officers spraying a chemical agent at protesters."  (*Id.* ¶ 41.)  Cosby alleges that he "approached the officers and sprayed them with a toy water pistol."  (*Id.* ¶ 42.)   At this point, "[m]ultiple unidentified Chicago police officers converged" on him and "threw him to the ground."  (*Id.* ¶ 43.) One unidentified officer "pressed" Cosby's "face into the ground, causing abrasions and bruising." (*Id.*)  Officers kept holding him down even though he had "allowed his body to go completely limp." (*Id.*)

"Defendant Officers"[1] then restrained Mr. Cosby with zip-tie cuffs, picked him up, and carried him toward a squadrol.[2]  (*Id.* ¶ 44.)  While he was being carried to the vehicle, Cosby "lost consciousness and one of his hands slipped out of the zip-ties," at which point officers "slammed"

---

[1]    The court here quotes language from the Second Amended Complaint, recognizing that (as discussed below, in Section I.A), Officer Rodriguez objects to Mr. Cosby's use of this phrase as improper group-pleading.

[2]    A squadrol is a police vehicle used as both a squad car and an ambulance. *Squadrol*, MERRIAM-WEBSTER.COM,  https://www.merriam-webster.com/dictionary/squadrol (last visited Jan. 4, 2024).

him to the ground.  (*Id.* ¶ 45.)  One officer "held [Cosby's] legs down"; another stepped on his head and hand; and one "repeatedly hit" him over the head with a baton.  (*Id.*)  The result was "bruising and abrasions" across Cosby's hand, legs, and head.  (*Id.*)  Then, finally in the squadrol, Mr. Cosby realized that he had lost one of his shoes; he asked an officer whether he could go and retrieve it, to which the officer responded, "fuck you."  (*Id.* ¶ 46.)  Cosby began feeling numbness in his left hand, but the officer driving the squadrol refused to loosen the zip-ties, whose tightness bruised his wrists.  (*Id.* ¶ 47.)

Once in custody at the CPD's First Precinct, Mr. Cosby was denied access to a restroom for four hours, and, despite repeated requests, was not given food or water for twelve hours and was not permitted to make a phone call for approximately twenty-four hours.  (*Id.* ¶¶ 48–49.)  At some point during this period, his friends and family tried to reach him by calling the First Precinct but "were told that he was not there."  (*Id.* ¶ 50.)  Eventually, CPD officers would also "ma[ke] inappropriate jokes" to Cosby's family and friends concerning his detention in the precinct's basement.  (*Id.*)  Cosby was charged with violating municipal code 8-4-10(f)—disorderly conduct[3]—and released, after about thirty-one hours in detention, at 3 a.m. on June 1, 2020.  (*Id.* ¶ 51.)  Defendant Gabriel Rodriguez is listed as the arresting officer.  (*Id.*)  Those charges were eventually dismissed, and the case "terminated in [Cosby's] favor" on August 13, 2020.  (*Id.* ¶ 52.)

### B.  *Monell*-related Allegations

Mr. Cosby alleges in his complaint that the violent treatment he suffered in 2020 was not an isolated occurrence but was instead a product of CPD policy or long-standing practice.  His complaint includes substantial information concerning the CPD's treatment of protesters during the summer of 2020 and in earlier years.  The court reviews those allegations below, beginning with historical ones, then describes reports concerning the CPD's response to the 2020 BLM

---

[3]    Section 8-4-10 defines activities that constitute disorderly conduct including, in subparagraph (f), "[a]ssembl[ing] with three or more persons for the purpose of using force or violence to disturb the public peace."

protests, and ends with Plaintiff's account of Superintendent Brown's involvement in those protests.

### 1. Historical Allegations

The complaint alleges that officers have responded with violence or aggression to protests for decades. In 2003, Cosby alleges, CPD "trapp[ed] over 800 protesters and by-standers [sic]" and refused to let them leave during a demonstration against the Iraq War, "storm[ed] into the crowd and str[uck] people with batons." (*Id.* ¶ 57.) In 2011, during an "anti-deportation demonstration," CPD "hit[] two legal observers in the face and falsely arrest[ed]" others who were trying to render aid to "a young woman and child that had been battered by a CPD officer." (*Id.*) Then, during a protest against President Donald Trump in 2016, CPD pushed, attacked, and used batons to beat protesters, as well as at least one member of the press. (*Id.*)

Beyond these historical allegations, Plaintiff also points to two reports and investigations from recent years criticizing CPD's response to protests. Both reports "directly resulted" from protests prompted by the release of a video that recorded the October 2014 fatal shooting of black Chicago teenager Laquan McDonald by CPD Officer Jason Van Dyke. (*Id.* ¶ 69.)

### 2. The Chicago Police Accountability Task Force Report

Plaintiff first discusses an April 2016 report of the Chicago Police Accountability Task Force ("CPAT"). (*Id.* ¶¶ 59–60.) That report found "substantial evidence" of "disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system" with respect to people of color in Chicago. (*Id.* ¶ 59.) The report concluded that racial bias is "not a thing of the past" and that "CPD's use of force disproportionately affects people of color." (*Id.* ¶ 60.) Accordingly, the report noted that "[t]he community's lack of trust in CPD is justified." (*Id.* ¶ 59.)

### 3. The 2017 DOJ Report

The Department of Justice (DOJ) also investigated the CPD and the Independent Police Review Authority (IPRA)—an independent agency tasked with police accountability—beginning

in 2015 and ending in January 2017. (*Id.* ¶ 61.) The report concluded that CPD officers carried out a pattern or practice of "unjustified, disproportionate, and otherwise excessive" force; that its officers engaged in unconstitutional acts of unnecessary force "with frequency"; and that such force "has been historically tolerated by CPD." (*Id.* ¶¶ 62–63.) These conclusions stemmed not just from use-of-force incidents but also from the DOJ's "investigation of CPD's training, supervision, accountability, and other systems . . . ." (*Id.* ¶ 63.) Relevant here, the DOJ found that CPD engaged in a pattern or practice of excessive, non-lethal force (including use of batons, body slams, and the like); making use of aggressive escalation in the face of nonviolent encounters with civilians; and "regularly us[ing] retaliatory force against people who object to being stopped, without cause." (*Id.* ¶¶ 64–66.)

### 4.    The Consent Decree and CPD Compliance Failures

A flurry of litigation sprang from the alleged practices and reporting, including lawsuits initiated by Black Lives Matter-Chicago and other groups, the ACLU of Illinois, and the Illinois Attorney General. (*Id.* ¶ 69, 69 n.12.) This litigation resulted in a consent decree between the State of Illinois and the City of Chicago, in effect since 2019, seeking to "remed[y] the policy and practice violations described" in Mr. Cosby's complaint.[4] (*Id.*)

Mr. Cosby points to a series of reports issued by the Independent Monitoring Team (IMT), which is overseen by this court and which monitors and issues biannual reports describing progress toward CPD and City compliance with the consent decree. (*Id.* ¶¶ 70–75, 80–82.) He notes that in its first and second reports, issued in November 2019 and June 2020, the IMT found that the CPD had failed to comply with certain of the decree's paragraphs. (*Id.* ¶¶ 72–73, 80–82.) The first report faulted the CPD for using "boilerplate language" in establishing a policy for

---

[4]    Federal court oversight of the Consent Decree was originally assigned to Judge Robert Dow of this court, and then, in late 2022, reassigned here. (*See* Consent Decree, *State of Illinois v. City of Chicago* (N.D. Ill. 2019) (No. 17-cv-6260), ECF No. 703; Exec. Committee Ord., *State of Illinois v. City of Chicago* (N.D. Ill. 2022) (No. 17-cv-6260), ECF No. 1049.)

appropriate use of force; the IMT preferred "more detailed examples of various de-escalation techniques in each policy . . . ." (*Id.* ¶ 73.)  According to Mr. Cosby, "[i]n terms of use of force, CPD [also] missed 16 out of 19 deadlines, and failed even preliminary compliance for 19 out of 25 Consent Decree paragraphs."[5]  (*Id.*)  The IMTs second report faulted CPD for failing to implement policies that would make it easier for members of the public and fellow officers to lodge complaints of officer misconduct, for example by protecting officers who report misconduct and otherwise anonymizing the misconduct-reporting process, and by creating a "written policy detailing how complaints will be transferred to the Accountability Sergeant."  (*Id.* ¶¶ 80–81.)

Mr. Cosby also asserts that the Consent Decree includes provisions which, if meaningfully implemented, would have prevented or mitigated his harm.  (*Id.* ¶ 75.)  For example, Plaintiff notes that the Consent Decree directs that officers not strike "subject[s] in the head or neck" with weapons like batons unless "deadly force is justified"; that they "request appropriate medical aid" after striking someone with such weapons, if "the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head"; that force not be used "as punishment or retaliation"; that officers allow people "to voluntarily comply with lawful orders whenever safe and feasible"; that they only use "OC devices"—pepper spray[6]—to disperse crowds when necessary, and only where "the Superintendent or his or her designee provides authorization"; and that they "interact with all members of the public in an unbiased, fair, and respectful manner," avoiding derogatory or racist language.  (*Id.*)

---

[5]        Mr. Cosby does not further detail these paragraphs' substance.

[6]        "Pepper spray, oleoresin capsicum spray, OC spray, capsaicin spray, or capsicum spray is a lachrymator (tear gas) product containing the compound capsaicin as the active ingredient that irritates the eyes to cause burning and pain sensations, and temporary blindness. Pepper spray is used as a less lethal weapon in policing, riot control, crowd control, . . . ." https://en.wikipedia.org/wiki/Pepper_spray (last visited January 6, 2024).

**5. CPD's Response to the BLM Protests**

Plaintiff alleges that "[t]he CPD and other City agencies responded" to the 2020 BLM protests in violent and aggressive ways. (*Id.* ¶ 3.) He points to an "in-depth examination" of the May 29–31 protests in downtown Chicago, which the *Chicago Reader*—a local news outlet—published that June, documenting eighty-three baton strikes on more than thirty individual protesters, more than half of them occurring while those protestors "were already on the ground" and nearly all of them "appear[ing] to violate [CPD] policy." (*Id.* ¶ 22.) The *Chicago Reader* also reported that such "uses of force often occurred in full view of supervisors who failed to intervene" or otherwise report them. (*Id.* ¶ 23.) Beyond batons, officers tackled and hit protesters; sprayed them with chemical agents; falsely arrested them; trapped them "in enclosed areas"; "targeted protest leaders" and others with "retaliatory, and lethal force"; destroyed protesters' property; called them "vile and vulgar names" including "misogynistic and homophobic" slurs like "pussy," "cunt," "bitch," and "faggots"; escalated encounters by taunting, shoving, pushing, or otherwise acting aggressively toward protesters; kneed protesters "in the neck and back"; jabbed them with batons; dragged them on the ground; and stomped on them. (*Id.* ¶¶ 3–6, 19–21, 24–25, 29.)

Plaintiff alleges that the officers' aggressive conduct was in part directed at protesters who "expressed concern" about how the officers were handling the demonstrations, as well as "those who were filming, or otherwise documenting police violence" during the protests. (*Id.* ¶¶ 26–27.) The officers' response resulted in many lost or destroyed phones, cameras, and other belongings. (*Id.* ¶¶ 27, 30.) The CPD's response to the 2020 BLM protests generated 591 official complaints by February of 2021, 58% of which alleged excessive force, and an investigation by the Civilian Office of Police Accountability ("COPA") resulted in numerous officers being "referred . . . for potential criminal prosecution" or otherwise disciplined. (*Id.* ¶ 34.)

**a. Reports Following the 2020 BLM Protests**

Plaintiff also notes findings in three reports published in 2021 that evaluated the CPD's response to the 2020 protests.

8

### (a) February 2021 CPD Report

First, Mr. Cosby describes a report that the CPD drafted and released in February 2021, called *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020*. Cosby alleges this report included "a number of key admissions about [CPD]'s failed response to the 2020 uprisings." (*Id.* ¶ 83 (citing CHICAGO POLICE DEPT., AFTER ACTION REPORT (2021) (hereinafter "After Action Report"), https://home.chicagopolice. org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf.) Broadly, Plaintiff describes the After Action Report as suggesting that officers were not prepared to respond to the type of large protests that occurred in 2020. (SAC ¶ 83 (citing After Action Report at 5).) Plaintiff also quotes language from the Report that details poor preparation for the "chaotic nature" of the protests, and notes that "some department members were observed . . . with their names and/or badges . . . obscured in violation of Department policy". (*Id.*)

### (b) OIG Report

The City of Chicago's Office of Inspector General released a separate report, also in February 2021, concerning the City's response to the protests. (SAC ¶ 85 (citing JOSEPH M. FERGUSON & DEBORAH WITZBURG, CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, REPORT ON CHICAGO'S RESPONSE TO GEORGE FLOYD PROTESTS AND UNREST (hereinafter "OIG Report") (2021), https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.) Plaintiff Cosby highlights a series of the OIG's findings based on interviews, arrest reports, sworn testimony, and body-cam footage.

The OIG Report diagnosed a "breakdown[] in the mass arrest process" during the protests, resulting in arrests without proper documentation and "lengthy delays in transportation and processing" of detainees, who were held for an average of fourteen hours and as many as fifty-three hours. (OIG Report at 9, 91; SAC ¶ 85.) The Report described the CPD's failures to meet reporting requirements concerning the use of force, such that "CPD underreported uses of baton strikes and manual strikes, further resulting in an inadequate record of severe and potentially out

of policy uses of force." (OIG Report at 9; SAC ¶ 85.) The OIG reported that CPD's SWAT team sprayed crowds with OC eighty-five times on May 30, 2020, justifying those incidents in reports by using nearly identical, boilerplate language. (OIG Report at 49, 111.) The Report noted that "baton strikes were deployed against non-assailants during the protests," and that protestors' reports of these strikes "suggest[ed that they were] . . both substantially more widespread and more dangerous than indicated . . . by officers"; that officers punched, kicked, and hit protestors with batons as a means of moving the crowd away from a bridge; and that there was "widespread noncompliance" with multiple police-accountability mechanisms, including the use of body cameras, the requirement that officers display name tags and badge numbers, and the practice of making a record of officers' uses of force. (OIG Report at 9–10, 41, 109–13; SAC ¶ 85.)

The Report also points to several incidents that were in fact recorded on officer body-cameras. In one instance, footage shows a CPD officer ignoring a protestor's request for seizure medication; later, when the officer later finds her "lying face-down in the vehicle," he says, "chick's having a seizure I guess" and continues to do nothing. (OIG Report at 50–51; SAC ¶ 85.) Other footage shows CPD officers using derogatory language: one "called a protester a 'little bitch' after they complained about pain," and another "was recorded telling other officers that he made a protester cry by telling them they would be raped in jail given their small size." (SAC ¶ 85 (quoting OIG Report at 51).) In another episode, body-cam footage shows a CPD officer beating a protester over the head and neck while the protester lies "face down on the floor." (*Id.* (quoting OIG Report at 114).)

### (c)    IMT Report

The last report Mr. Cosby references is a special report that the IMT issued under the Consent Decree in July 2021, concerning CPD's handling of the BLM protests in 2020. (SAC ¶ 86 (citing Special Report: The City of Chicago's and the Chicago Police Departments Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020) (hereinafter "IMT Protest Report"), *State of Illinois v. City of Chicago* (N.D. Ill. 2017) (No. 17-cv-06260)).) The IMT

reported it had heard "from many community members" who experienced or saw widespread verbal and physical abuse during the protests. (IMT Protest Report at 13; SAC ¶ 86.) The Report faulted the City for failing to implement policies or training to respond to the protests effectively. (IMT Protest Report at 14; SAC ¶ 86.) It noted that "some officers engaged in various levels of misconduct and excessive force," but that the exact number of such incidents "may be unknowable" due to "reporting and tracking challenges," including a large number of officers—"at least 5,676"—who were deployed to the protests that summer without body-worn cameras, ostensibly "to preserve battery life." (IMT Protest Report at 14, 18, 140; SAC ¶ 86.) What body-camera footage did exist, the Report found, showed "many examples of officers communicating disrespectfully and using force"; the examples included baton strikes, dragging a woman along the ground before hoisting her up, punching people, throwing bicycles at people, and "swinging [a] baton like a baseball bat." (IMT Protest Report at 70–71, 95; SAC ¶ 86.) The Report relayed an instance in which officers mocked a pregnant, Black protester they had arrested after she asked for water (and did not give her any) and compared this treatment with an officer's "gentle approach" to a white protester who promised he would head home. (IMT Protest Report at 71; SAC ¶ 86.)

Beyond these uses of force, the Report also found that officers engaged in "escalatory" and other aggressive behavior: advancing toward protesters without warning (or apparent reason), swearing at protesters and "calling [them] slurs" or—especially those looting or acting violently—"animals" or "savages," and making otherwise disparaging comments about protesters, including things like "They think they're something. They all need they ass whooped. It's embarrassing." (IMT Protest Report at 71, 77, 129–30, 193–94; SAC ¶ 86.)

### b. Allegations Specific to Superintendent Brown

Finally, Mr. Cosby's complaint makes allegations concerning David Brown, who was the superintendent of the CPD in May 2020. (*Id.* ¶ 14.) Cosby alleges that Brown was "responsible for the general management and control" of the CPD with "complete authority to administer the

Department."  (*Id.* ¶ 36.)  Brown made "all command decisions" concerning the CPD's response to the BLM protests and, according to Mr. Cosby's complaint, "encouraged and permitted" CPD officers to "target, attack, and harass protesters" while "t[aking] no action to halt" their alleged misconduct.  (*Id.*)  Cosby alleges that Brown was "physically present" for "at least one protest," described himself as standing "shoulder to shoulder" with CPD officers there, and did not personally intervene to stop the "violence and misconduct" that officers engaged in at the May 2020 protest or others that summer.  (*Id.*)

Later that year, Superintendent Brown defended officers' behavior at a specific BLM protest in August 2020; Brown claimed, according to Mr. Cosby's complaint, that protesters were the initial aggressors.  (*Id.* ¶ 37.)  By October, however, Superintendent Brown "acknowledged serious ongoing and systemic deficiencies within the CPD" by telling recruits that "this civil unrest is about you."  (*Id.* ¶ 38.)  During that address, he also "acknowledged that 'good cops don't tell on the bad cops' and that CPD has a culture of 'protecting each other'" such that holding officers accountable is difficult.  (*Id.* ¶ 38.)

## II.    Procedural Background

Mr. Cosby's Second Amended Complaint alleges seventeen counts arising under Illinois and federal law, most of them directed against Defendant Rodriguez.  Constitutional claims under 42 U.S.C. § 1983 include:  (I) excessive force in violation of the Fourth Amendment; (II) retaliatory use of force in violation of the First Amendment; (III) violation of the Fourteenth Amendment's Equal Protection Clause; (IV) with 42 U.S.C. §§ 1985 and 1986, racially-motivated conspiracy to deprive Mr. Cosby of constitutional rights; (V) false arrest in violation of the Fourth Amendment; (VI) unlawful search and seizure in violation of the Fourth and Fourteenth Amendments; (VII) conspiracy to deprive Mr. Cosby of constitutional rights; and (VIII) failure to intervene.  State-law claims against Defendant Rodriguez include alleged violations of the Illinois Constitution (X); assault and battery (XI); intentional infliction of emotional distress (XII); false arrest (XIII); malicious prosecution (XIV); and conspiracy (XV).  As against the City of Chicago, Mr. Cosby's

complaint alleges a § 1983 *Monell* claim (IX), an Illinois *respondeat superior* claim (XVI), and an Illinois indemnification claim (XVII). Finally, Mr. Cosby names Superintendent Brown as a Defendant in his individual capacity, on the failure to intervene claim (VIII); and in his official capacity, on the *Monell* claim (IX). (SAC ¶¶ 87–185.)

Defendants move to dismiss Mr. Cosby's claims pursuant to Rule 12(b)(6).

### A.  Defendant Rodriguez's Motion to Dismiss

Defendant Rodriguez seeks dismissal of all Counts against him. (Officer Rodriguez's 12(b)(6) Mot. to Dismiss Pl.'s Second Am. Compl. (hereinafter "Rodriguez MTD") [37].) He argues that the court should dismiss the excessive force claims (Counts I, II, III, VIII, and XI) because, beyond noting that Officer Rodriguez signed his name as the arresting officer, the complaint relies on group pleading. Rodriguez contends the court should dismiss the wrongful arrest claims (Counts III, V, VI, VII, XII, XIII, and XIV) because officers had probable cause to arrest Cosby: he sprayed the officer with a water gun. Cosby's First Amendment claim (Count II) fails, Rodriguez argues, because Cosby was not engaged in protected speech when he sprayed the officers and because his speech did not motivate the officers in using force or arresting him. Rodríguez argues that Cosby's Fourteenth Amendment claims (Counts III and VI) are not cognizable. Fifth and finally, Rodriguez claims that Counts IV, VII, and XV—which allege conspiracy—fail because conspiracy requires an alleged tortious act, and none has been pleaded.

### B.  Defendants City of Chicago and Superintendent Brown's Motion to Dismiss

The City of Chicago and Superintendent Brown filed a separate 12(b)(6) motion seeking to dismiss the failure-to-intervene claim (Count VIII) and the *Monell* claim (Count IX). (City of Chicago and Superintendent David Brown's Partial Mot. to Dismiss Pl.'s Second Am. Compl. and Mem. of Law in Supp. (hereinafter "City MTD") [39].) The failure-to-intervene claim must be dismissed as against Brown, they argue, because Cosby has not alleged that Brown was physically present at the protest or "had a realistic opportunity to prevent" Cosby's injuries. (*Id.* at 1–2.) The *Monell* claim fails, they argue, because Cosby has not sufficiently alleged a policy,

practice, or custom of the City or Superintendent Brown.  Specifically, the City Defendants note Cosby's allegations concerning the City's agreement to and effort to comply with the Consent Decree, as well as other police reform measures—efforts that "demonstrate a deliberate intention to *remedy* the kinds of violations Plaintiff alleges, not a deliberate indifference to such violations as is required to plead a *Monell* claim."  (*Id.* at 8.)  Finally, Defendants argue that, by naming both the City and Superintendent Brown, Plaintiff's *Monell* claim is duplicative and therefore ought to be dismissed with respect to Defendant Brown.  (The City of Chicago and Superintendent David Brown's Reply in Supp. of Partial Mot. to Dismiss Pl.'s Second Am. Compl. (hereinafter "City MTD Reply") [63] at 7.)

## DISCUSSION

### I.    Claims Against Officer Rodriguez

As noted, Cosby's claims against Officer Rodriguez fall into several groups. Officer Rodriguez's challenges to these claims are addressed below.

### A.    Claims Related to Excessive Force (Counts I, II, III, VIII, and XI)

In those counts in which Plaintiff alleges that excessive force was used against him, Plaintiff identifies the wrongdoers as "Defendant Officers," "unidentified officers," "an officer," and the like.  Defendant Rodriguez argues that Cosby has thus failed "to allege facts to support personal involvement by Officer Rodriguez."  (Rodriguez MTD at 4.)  Rodriguez points out that the only time the complaint explicitly mentions him is when it notes that he was listed as Mr. Cosby's arresting officer.  (*Id.* at 6.)  As Cosby's overbroad allegations are "directed at a varying combination of unknown individuals which may or may not include Officer Rodriguez," Defendant argues, they do not adequately allege Rodriguez's personal involvement and must therefore be dismissed.  (Officer Rodriguez's Reply in Supp. Of His Rule 12(b)(6) Mot. To Dismiss Pl.'s Second Am. Compl. (hereinafter "Rodriguez Reply") [60] at 1, 3, 5.)

A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2013) (quoting

*Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L.Ed.2d 1081 (2007)). And, because liability for a violation of § 1983 requires that "the defendant personally participated in or caused the unconstitutional actions," *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981), a complaint alleging unconstitutionally excessive force must allege specific personal involvement on the part of the defendant, "adequately connect[ing] specific defendants to illegal acts." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009); *see also Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). Group pleading, in which a plaintiff refers to a collective group of defendants as opposed to specifically identifying individual action, can run afoul of these pleading requirements. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed.")

Group pleading *per se*, however, is not necessarily grounds for dismissal. Instead, when a complaint references unnamed defendants or a group of defendants, the court considers whether the "factual circumstances in th[e] case" are such that the use of group language is nevertheless sufficient to provide notice to an individual defendant of the claims against him. *Cf. Alejo*, 328 F.3d at 936 (in affirming dismissal of complaint on group-pleading grounds, stressing that the "factual circumstances in this case" made it impossible to infer specific named defendants' personal involvement); *see also Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013) (refusing to dismiss plaintiff's complaint on group-pleading grounds because "reading the allegations sensibly and as a whole, there is no genuine uncertainty regarding who is responsible for what"). In other words, "the key is to generally name the 'persons responsible for the problem.'" *Hyung Seok Koh v. Graf*, No. 11-cv-02605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013) (quoting *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009)).

Mr. Cosby's complaint in this case, despite lacking some clarity, provides Officer Rodriguez with sufficient notice to survive dismissal. Drawing all inferences in Mr. Cosby's favor, the court reads the complaint to allege that Officer Rodriguez was present and participated in the

unconstitutional behavior Cosby alleges. In recounting his arrest, Mr. Cosby repeatedly makes use of the phrase "Defendant Officers"—a phrase which, fairly read, *must* encompass Officer Rodriguez as he is the only defendant officer identified in the complaint.[7] (SAC ¶¶ 43–47.) Take, for example, the following paragraph of Mr. Cosby's complaint:

> The Defendant Officers slammed Plaintiff Cosby to the ground, and one officer held his legs down while another officer stepped on Plaintiff Cosby's head, and then stepped on his hand. One officer then pulled out his baton and repeatedly hit Plaintiff Cosby over the head with it. This assault caused bruising and abrasions to Plaintiff Cosby's head, hand, and legs.

(*Id.* ¶ 45.) Given that Rodriguez is the only named officer, it is fair to infer that each alleged act— slamming him to the ground, holding his legs down, stepping on his head and hand, hitting him over the head with the baton—is either: a) directly attributable to Rodriguez; or b) an act in which Rodriguez participated by being present, witnessing the wrongdoing, and failing to intervene to stop. Plaintiffs may plead in the alternative, and Mr. Cosby alleges both excessive-force claims and group-related claims (like failure-to-intervene and conspiracy) against Officer Rodriguez. Cosby's use of the phrase "Defendant Officers" places Rodriguez at the scene, and Cosby's failure or inability to tie each act to Rodriguez does not require dismissal.

More broadly, though it is obvious that not every kick or baton strike came from Officer Rodriguez, it would be "unfair and illogical" to require Mr. Cosby, who alleges he was being beaten, to somehow keep track of who shoved him to the ground, who held him down, and who beat him in the head with a baton. *Wilson v. City of Chicago*, No. 09 C 2477, 2009 WL 3242300, at *2 (N.D. Ill. Oct. 7, 2009). This is especially true in the context of a chaotic protest, where it

---

[7]     Superintendent Brown, who was technically an officer, is also named as a Defendant in Count VIII (the failure-to-intervene claim), but the parties appear to agree that the complaint (a) does not define Brown as encompassed by the term "Defendant Officers"; and in fact (b) alleges that Brown was not present at Cosby's arrest. (*Compare* SAC ¶ 127 (alleging Count VIII against "all Defendant Officers *and* Defendant Superintendent David Brown" (emphasis added)), *with* Rodriguez Reply at 2 ("Officer Rodriguez is the only named Chicago Police Officer defendant and the only officer accused of violating Plaintiff's constitutional rights.").) The court does not read Mr. Cosby's inclusion of Superintendent Brown on Count VIII as an allegation that Brown was physically present with Rodriguez at Cosby's arrest.

would undoubtedly be difficult to keep track of what was going on and when; indeed, Mr. Cosby alleges elsewhere in his complaint that officers generally removed or lacked identifying badges or nametags and, in some cases, did not use their body cameras. (*See* SAC ¶¶ 83, 85.) A pleading standard that "require[d] a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer . . . . would effectively allow police officers to violate constitutional rights with abandon as long as they ensured they could not be individually identified . . . ." *Sibley v. Dart*, No. 17-CV-6298, 2019 WL 670270, at *4 (N.D. Ill. Feb. 19, 2019) (quoting *Koh v. Graf*, No. 11–cv–02605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013)).

Rule 8 does not require that result. Indeed, "where a plaintiff has been injured 'as the consequence of the actions of an unknown member of a collective body, identification of the responsible party may be impossible without pretrial discovery,' 'and . . . courts should not dismiss such claims.'" *Wilson*, 2009 WL 3242300, at *2 (quoting *Rodriquez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009)). Here, the alleged unconstitutional acts—the types of force used when arresting Mr. Cosby—are straightforward, and the complaint provides enough notice to Officer Rodriguez to withstand scrutiny under Rule 8. To survive summary judgment, Mr. Cosby will have to tie Officer Rodriguez specifically to each allegedly unconstitutional act. As the parties have not yet engaged in discovery that might enable Plaintiff to meet this burden, the court declines Rodriguez's request to dismiss Counts I, II, III, VIII, and XI.

### B. False Arrest Claims

Officer Rodriguez next argues that Cosby effectively "pleads himself out of court" on his claims that relate to illegal arrest by alleging facts that show the officers had probable cause to arrest him. (Rodriguez MTD at 7.) "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). The same is true for analogous Illinois-law claims. *Penn v. Harris*, 296 F.3d 573, 576–77 (7th Cir. 2002). The parties

17

appear to agree that probable cause to arrest Mr. Cosby would defeat certain of his claims predicated on unlawful arrest. (Rodriguez MTD at 7; Pl.'s Resp. to Def. Officer Rodriguez's Mot. to Dismiss Pl.'s Second Am. Compl. (hereinafter "Pl.'s Rodriguez Resp.") [53] at 6.) But before discussing whether Mr. Cosby's complaint alleges probable cause existed to arrest him, it is necessary to clear up ambiguities in the briefing as to which counts are implicated.

### 1. Which Counts are Challenged?

Unfortunately, the briefing is unclear on this question. In the sections of Defendant's briefing seeking dismissal of Plaintiff's claims on probable-cause grounds, Officer Rodriguez at times asks the court to dismiss Counts III, V, VI, VII, XIII, and XIV (Rodriguez MTD at 7 (heading); Rodriguez Reply at 5), and at other times seeks dismissal of Counts III, V, VI, XII, XIII, and XIV. (Rodriguez MTD at 7, 8, 10; Rodriguez Reply at 9.) Read together, it is unclear whether Defendant seeks dismissal of Count VII (conspiracy to deprive Plaintiff of his constitutional rights), Count XII (intentional infliction of emotional distress ("IIED")), or both, at least on the grounds that they are defeated by allegations that establish there was probable cause for Cosby's arrest. The issue is never clarified—indeed, it becomes only more inscrutable—when the court examines the parties' briefs and Mr. Cosby's complaint.[8] In the interest of moving this case past the pleading

---

[8]     For example, Rodriguez notes, in a string cite, that "an IIED claim premised upon a wrongful arrest/prosecution may not be sustained if there was, in fact, probable cause for such arrest/prosecution." (Rodriguez MTD at 11 (citing *Larsen v. Elk Grove Vill., Ill.*, 433 F. App'x 470, 474 (7th Cir. 2011)).) This suggests that he is arguing that the existence of probable cause defeats Count XII. On the other hand, Count VII accuses officers of agreeing to "unlawfully use force on Plaintiff, and to detain and arrest Plaintiff, knowing they lacked . . . probable cause to do so . . . ." (SAC ¶ 122.) A theory of liability under Count VII, then, involves Plaintiff's illegitimate arrest. So, which count is challenged?

Plaintiff's briefs appear to assume that Rodriguez seeks dismissal only of Count VII; Plaintiff makes no mention of Count XII in the section of his response brief arguing that the officers did not have probable cause to arrest him. (*See* Pl.'s Rodriguez Resp. at 6.) Further confusing matters, Mr. Cosby *does* argue in an early footnote in his response brief that Rodriguez has waived objections to Count XII because he "does not assert any specific argument for the dismissal of . . . Count XII"—an assertion that seems to ignore the string citation in Rodriguez's motion to dismiss concerning IIED and legal arrest. (Pl.'s Rodriguez Resp. at 3 n.1.) Completing the circle, Rodriguez's own reply brief either ignores or misses Plaintiff's footnote; Rodriguez does

stage, the court will assume that Rodriguez is asking the court to dismiss both counts on probable-cause grounds.

## 2. Which Counts Hinge on Probable Cause?

Next, there appear to be material differences between how a finding of probable cause would influence the viability of certain of the counts Rodriguez seeks to dismiss. Because probable cause invalidates claims for false arrest and malicious prosecution, Counts V (false arrest), VI (unlawful search and seizure), XIII (Illinois false arrest), and XIV (Illinois malicious prosecution), all live or die on whether Plaintiff's arrest as alleged was illegal.[9] The court thus must dismiss those counts if Plaintiff pleaded facts showing that Officer Rodriguez had probable cause to arrest him.

But other claims—including Counts III and, to the extent they are in fact being challenged, Counts VII and XII—may survive regardless of the existence of probable cause, as they allege multiple theories of liability. Count III alleges a violation of Fourteenth Amendment's Equal Protection Clause in officers' "subject[ing] Plaintiff, who is Black . . . to excessive force *and/or* unlawful detention and arrest . . . with discriminatory motive and intent . . . ." (SAC ¶ 101 (emphasis added).) Similarly, Count VII alleges that officers "enter[ed] into an agreement to unlawfully use force on Plaintiff, and to detain and arrest Plaintiff, knowing they lacked reasonable suspicions and/or probable cause to do so, and for the purpose of violating Plaintiff's First, Fourth, and Fourteenth Amendment rights." (SAC ¶ 122.) Reading Plaintiff's Second Amended Complaint generously, the officers could have violated his constitutional rights—the basis for this

_____

not specify in his reply whether he meant to object to Count XII of the complaint on probable-cause grounds, nor does he argue further as to why the count(s) should be dismissed.

[9] As to Count VI, though excessive force would constitute an unlawful "seizure," Plaintiff alleges excessive force in different counts, and this count appears to be solely directed at search incident to an unlawful arrest. (*See* SAC ¶ 116 (singling out "[t]he actions by the Defendant Officers in knowingly searching and seizing Plaintiff's property during the events described in the Complaint, without a warrant, probable cause, or legal justification" as unlawful).)

count—simply by agreeing to employ excessive force against him. Read this way, Count VII's conspiracy claim does not hinge on the legality of Plaintiff's arrest. And Count XII simply alleges IIED in "[t]he conduct and actions of the Defendant Officers set forth above," which includes Cosby's arrest, but also includes Rodriguez's alleged use of excessive force and other mistreatment; each of those allegations alone could arguably be classified as "extreme and outrageous conduct" supporting an IIED claim. (*Id.* ¶¶ 157–58.) Count XII survives dismissal because it is not predicated entirely on a false arrest.

Accordingly, the court declines to dismiss Count III (or Counts VII or XII, assuming Rodiguez in fact seeks dismissal of those counts). Contrarily, the court addresses Counts V, VI, XIII, and XIV, which *are* predicated on an unlawful arrest, as explained below.

### 3. Was there Probable Cause for Cosby's Arrest?

Probable cause exists and justifies arrest when "the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013)). "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57, 138 S. Ct. 577, 199 L.E.2d 453 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 188 L.E.2d 46 (2014)). Rather, it represents a "common-sense inquiry requiring only a probability of criminal activity." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)).

Defendant Rodriguez alleges that Mr. Cosby's admission that he approached officers and sprayed them with a water gun is sufficient to show that officers had probable cause to arrest him for numerous Illinois crimes. (Rodriguez MTD at 7–11.) Rodriguez focuses on five: disorderly conduct (720 ILCS § 5/26-1(c)(2)); battery (720 ILCS § 5/12-3); aggravated battery (735 ILCS § 5/12-3.05(d)); obstruction (720 ILCS § 5/31-1(a)); and reckless conduct (720 ILCS § 5/12-5). And the parties spend much of the briefing arguing whether the facts Mr. Cosby alleges

meet the elements of each criminal statute.  (*See* Rodriguez MTD at 7–11; Pl.'s Rodriguez Resp. at 6–10.)  The court begins and ends with battery.

In Illinois, a battery occurs when one "knowingly without legal justification by any means . . . makes physical contact of an insulting or provoking nature with an individual." 720 ILCS § 5/1-3(a).  If the person committing the battery knows their victim is a police officer, that battery becomes aggravated battery.  720 ILCS § 5/12-3.05(d)(4).  Cosby concedes that "Illinois courts have held that spitting or throwing substances like water or urine at an officer can amount to physical contact of an insulting or provoking nature."  (Pl.'s Rodriguez Resp. at 8.)  Indeed, in one Illinois case, the court upheld, in relevant part, an aggravated-battery conviction for someone who had spit on an officer, noting that "[k]nowingly or intentionally spitting on a police officer is physical contact of an insulting or provoking nature."  *People v. Taylor*, 2022 IL App (4th) 210507, ¶ 18, 216 N.E.3d 338, 344, *appeal denied,* 201 N.E.3d 576 (Ill. 2023) (citing *People v. Peck*, 260 Ill. App. 3d 812, 814–15, 633 N.E.2d 222 (4th Dist.1994)).  Another Illinois court upheld an aggravated-battery conviction for a prisoner who "threw a liquid substance on two correctional employees engaged in the execution of their official duties."  *People v. Walker*, 291 Ill. App. 3d 597, 599, 683 N.E.2d 1296, 1299 (4th Dist.1997).  The parties disputed whether that liquid was water or urine, but the court held that the distinction "would make no difference," as throwing water on someone was sufficient to support an aggravated-battery conviction in that context.  *Id.* at 601, 603–04; 683 N.E.2d at 1299, 1301.

Plaintiff's sole basis for challenging the existence of probable cause to arrest him for battery or aggravated battery appears to be his argument that "he sprayed officers with the toy water gun, but he does not allege that the water made physical contact with any officer."  (Pl.'s Rodriguez Resp. at 8.)  This argument fails for numerous reasons.  For one, Plaintiff's complaint itself states that "Plaintiff Cosby approached the officers and sprayed them with a toy water pistol." (SAC ¶ 42.)  By any plain reading of this sentence, water hit the officers, as the verb "spray" implies physical contact and is defined as "to project spray or something resembling spray *on* or

*into*." *Spray*, Merriam-Webster.com (last visited Dec. 20, 2023), https://www.merriam-webster.com/ dictionary/spray (emphasis added). More importantly, that water hit the officers is not necessary to a finding of probable cause here; probable cause spans situations in which the "suspect has committed, is *committing*, or is *about to commit* an offense." *Ewell*, 853 F.3d at 919 (emphasis added). If a reasonable officer could have anticipated offensive contact—in this case, an unknown liquid substance being sprayed at or on him during a contentious protest—that officer would not have to wait until getting hit to arrest the sprayer for battery (or attempted battery).

Cosby alleges here that when he "observed multiple unidentified Chicago police officers spraying a chemical agent at protesters," he "approached the officers and sprayed them with a toy water pistol." (SAC ¶¶ 41–42.) It is not unreasonable for an officer, in this context, to view an unknown liquid sprayed at or on him as offensive or provocative physical contact. Though Cosby may believe the officers' response was disproportionate, the arrest was supported by probable cause. Accordingly, the court dismisses Counts V, VI, XIII, and XIV of Mr. Cosby's complaint. Furthermore, because it does not appear that Plaintiff could amend his Complaint to remove this defect, the Counts are dismissed with prejudice.

### C.    First Amendment Claim

Officer Rodriguez next seeks dismissal of Count II of Plaintiff's complaint on the ground that Cosby has not adequately alleged a First Amendment violation. A First Amendment claim requires: 1) that the plaintiff engaged in constitutionally protected speech; 2) that "he suffered a deprivation that would likely deter First Amendment activity in the future"; and 3) that the plaintiff's speech "was 'at least a motivating factor' in the Defendant['s] decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). Rodriguez focuses on the first and third prongs of this test. First, he argues that Cosby was never engaged in protected speech. (Rodriguez MTD at 12–13.) Rodriguez then argues that even if Cosby were engaged in protected speech by participating in the protest or spraying the officers, his complaint does not plausibly plead that such speech

caused Officer Rodriguez to use force against him or arrest him.  (*Id.* at 13–14.)   As explained below, these arguments do not require dismissal of the First Amendment claim on a Rule 12(b)(6) motion.

### 1.    Whether Mr. Cosby's Actions Constituted Protected Speech

Rodriguez makes two arguments that Mr. Cosby was not engaged in protected speech at the time of the arrest.  First, Rodriguez contends that "[w]hile Plaintiff avers that he was protesting anti-Black racist police violence in support of the movement for Black lives, in actuality, he does not discuss any specific protected speech" in which he engaged.   (Rodriquez MTD at 12.) Rodriguez appears to believe that because Cosby's complaint does not allege that he used any particular phrase, or carried a particular sign, at the protest, Cosby was not engaged in protected speech.  (*See id.* at 12; Rodriguez Reply at 10.)

But simply participating in a protest is a "pristine and classic" form of protected speech. *Edwards v. South Carolina*, 372 U.S. 229, 235–36 83 S. Ct. 680, 9 L.Ed.2d 697 (1963).  Indeed, group demonstrations are quintessential protected speech.  *See Snyder v. Phelps*, 562 U.S. 443, 458, 131 S. Ct. 1207, 179 L.Ed.2d 172 (2011) (holding that the Westboro Baptist Church's "picketing" on public land near a soldier's funeral "is entitled to special protection under the First Amendment" (quotation omitted)); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 568–69, 115 S. Ct. 2338, 132 L.Ed.2d 487 (1995) (in finding private parade protected by First Amendment, noting that "the inherent expressiveness of marching to make a point explains our cases involving protest[s]") (citing *Gregory v. Chicago*, 394 U.S. 111, 112, 89 S. Ct. 946, 22 L.Ed.2d 134 (1969); *Edwards*, 372 U.S. at 235)).  Here, Cosby "participated in a demonstration" that was designed to rail "against anti-Black police violence . . . ."  (SAC ¶¶ 39, 40.)  This squarely places him within the First Amendment's ambit.

Arguing the contrary view, Rodriguez cites *Wernsing v. Thompson*, a Seventh Circuit employment case in which the court found that the plaintiffs' emails to the then-Inspector General of the Illinois Department of Human Services (DHS) asking for a meeting to discuss "concerns"

about "who we understand you are going to appoint as the Southern Bureau Chief" did not constitute "speech on a matter of public concern" because they "articulate no viewpoint, grievance, or complaint; they merely request a meeting . . . ." 423 F.3d 732, 737–38, 752 (7th Cir. 2005). *Wernsing* is inapposite for multiple reasons. For one, it concerns a public employee's free speech rights, which may be limited in ways private citizens' speech is not. *See Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004) (noting that while public employees maintain First Amendment rights, "a public employee does not possess unlimited rights of expression on matters related to official responsibilities."); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L.Ed. 2d 689 (2006) ("Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.") Moreover, *Wernsing*'s facts stray far from participation in a protest; emails to an individual seeking a meeting are simply incomparable to joining a public demonstration designed to articulate a specific viewpoint of acute public concern.

Nor does Mr. Cosby's having sprayed the officers with a water gun necessarily doom his First Amendment claim. Officer Rodriguez argues that Mr. Cosby was not engaged in protected speech "because the admitted activity [in the complaint] . . . constitutes a criminal act, not protected speech." (Rodriguez MTD at 12.) To support this, he cites to caselaw concerning types of speech which do not enjoy First Amendment protection, including fighting words. (*See id.* (citing *Gower v. Vercler*, 377 F.3d 661, 670 (7th Cir. 2004) (fighting words); *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L.Ed.2d 535 (2003) (same); *Cantwell v. State of Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 84 L.Ed.2d 1213 (1940) (noting that "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious."); *Utley v. City of Houston*, No. 21-20623, 2022 WL 2188529, at *1 (5th Cir. June 17, 2022) (per curiam) (holding that First-Amendment claim failed because protester "was not engaged in constitutionally protected activity when he was arrested—he was obstructing a

24

roadway in violation of [Texas law]")).) In other words, Officer Rodriguez cites to cases showing that there are situations in which certain speech—fighting words, protesting in a time place or manner appropriately prohibited, and the like—can be grounds for arrest. He follows this by stating that "Plaintiff's admission that he committed numerous criminal offenses while at a protest is not protected speech as it was made or in aid of making a breach of the peace." (Rodriguez MTD at 13.)

Plaintiff, too, cites to cases centered on retaliatory arrest, but none directly support his false arrest claim First, he cites *Nieves v. Bartlett*, 587 U.S. __, 139 S. Ct. 1715, 1727, 204 L.Ed.2d 1 (2019), but in that case, the Court confirmed that a claim of false arrest in violation of the First Amendment ordinarily requires the plaintiff to plead and prove the absence of probable cause for the arrest. In *Nieves*, plaintiff was arrested for approaching an officer "in an aggressive manner," soon after having shouted at a group the defendant officer was speaking with at a "raucous" event, and urging the group "not to talk to the police." *Id.* at 1717. The Court affirmed dismissal of his First Amendment claim because probable cause—plaintiff's aggressive approach to a fellow officer—supported his arrest. In so doing, the Supreme Court recognized a narrow exception: the existence of probable cause would not defeat a retaliatory arrest claim if the plaintiff could show that he was arrested for an offense (for example, jaywalking) for which persons not engaged in protected speech had not been arrested. *Id.* at 1727. Plaintiff Cosby has not suggested that persons who shoot water at a police officer are not ordinarily arrested.

Plaintiff also points to *Lozman v. City of Riviera Beach*, in which the Supreme Court held that the existence of probable cause to arrest a man who had criticized public officials did not extinguish his First Amendment claim. 585 U.S. __, 138 S. Ct. 1945, 1951, 1955, 201 L.Ed.2d 342 (2018). The plaintiff in that case alleged that "high-level city policymakers" "adopted a plan to retaliate against" him for having spoken out against various city policies concerning its waterfront, and "then ordered his arrest when he attempted to make remarks during the public-comment portion of a city council meeting." *Id.* at 1949. Plaintiff was arrested for refusing to leave

the podium—conduct that, he conceded, provided probable cause for his arrest.  *Id.* at 1951.  In concluding that the existence of probable cause did not defeat plaintiff's First Amendment claim, the Supreme Court distinguished typical cases involving officers' "split-second" decisions to arrest.  *Id.* at 1953.  Those are the circumstances alleged in Cosby's case.

As recognized in another case Plaintiff cites, "disentangling . . . probable cause from an impermissible retaliatory motive" can keep a First Amendment arrest-related claim alive.  Thus, in *Hudkins v. City of Indianapolis*, No. 1:13-CV-01179-SEB, 2015 WL 4664592, at *15 (S.D. Ind. Aug. 6, 2015), the plaintiff was arrested for disorderly conduct immediately after announcing to the police that he was engaged in lawful activity: filming an officer's conduct in subduing another individual.  The court concluded that plaintiff could challenge the arrest as a violation of the First Amendment despite the fact that the officer had probable cause to arrest him for disorderly conduct.[10]  In this case, however, unlike in *Hudkins*, officers were not bothering Cosby until he shot at them with a water gun; in other words, under the facts as he alleges them, his arrest was prompted by the (illegal) act of spraying them with a water gun, not by his separate participation in the protest.

Notably, however, Cosby's arrest is not the only basis for his First Amendment claim.  He also challenges the force used against him in carrying out his arrest.  Indeed, Mr. Cosby's First Amendment claim states that: "[t]he Defendant Officers retaliated against Plaintiff for engaging in protected speech by subjecting him to excessive force without legal justification and/or failing to intervene to prevent the use of excessive force."  (SAC ¶ 96.)  If Officer Rodriguez was motivated by Mr. Cosby's expressive conduct as a protestor to use excessive force in carrying out his (otherwise legitimate) arrest, Cosby's First Amendment claim predicated on the excessive force

---

[10]     The court nevertheless granted summary judgment in favor of the officer on qualified immunity grounds.  2015 WL 4664592 at *16, 17.  The court concluded (pre-*Nieves* and *Lozman*) that "neither our circuit nor the Supreme Court has 'recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause.' "  *Id*. at 16 (citations omitted).

could be colorable. Extrapolating from the principle evinced in the cases discussed above, an impermissible retaliatory motive could have fueled Officer Rodriguez's use of excessive force as alleged in Mr. Cosby's Complaint.

In sum, Cosby's claim that his arrest violated the First Amendment fails, but his allegation that the officers' use of excessive force violated the First Amendment survives Rule 12(b)(6) challenge.

### 2.   Has Plaintiff Alleged that his Speech Motivated the Officers?

To survive dismissal, a First Amendment retaliation claim requires that the plaintiff plausibly allege that "protected speech was a motivating factor in the deprivation . . . ." *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019). Both direct and circumstantial evidence are permissible in establishing that motivation, including "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [people] in the protected group." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965–66 (7th Cir. 2012) (quoting *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)). The question is thus whether Plaintiff's complaint points to direct or circumstantial facts showing that his participation in the BLM protest at least in part motivated Defendant Rodriguez's treatment of him during the arrest.

Plaintiff's complaint meets this bar. As Mr. Cosby's response brief notes, "while Defendant insists that the officers were motivated only by Plaintiff's use of the toy water gun, the viciousness of the response suggests otherwise." (Pl.'s Rodriguez Resp. at 14.) Indeed, Cosby alleges that officers held him down even after he went limp; that they restrained him with zip-tie handcuffs and refused to loosen them when he complained of pain; that they repeatedly hit him over the head with a baton while he lay prone; that, when he asked if he could retrieve his lost shoe, an officer replied, "fuck you"; and that, once at the station, he was denied access to a restroom, food, and water for many hours. (SAC ¶¶ 43–49.) And Cosby alleges that this occurred in the context of widespread similar treatment of (at least sometimes peaceful) protesters. Officers allegedly used

slurs, referring to other protestors as "pussy," "cunt," "bitch," "faggots," "animals," and "savages"; made comments like "[t]hey think they're something. They all need they ass whooped" (SAC ¶¶ 29, 86); refused protesters' requests for water, seizure medications, and the like (*id.* ¶¶ 85–86); warned a protester that "they would be raped in jail" and called another a "little bitch" (*id.* ¶ 85); sprayed "peaceful protesters" with pepper spray (*id.*); and frequently used types and amounts of force that at least one report concluded constituted violations of CPD policy (*id.* ¶ 22).

Nor does it require a great inferential leap to conclude, as Plaintiff's complaint alleges, that Rodriguez was motivated to behave this way by Plaintiff's protected speech: Rodriguez and other officers allegedly directed this violent behavior toward people who were protesting *police violence*. Inferring from the circumstances alleged in the complaint and in the light most favorable to Mr. Cosby, the BLM protest's aim suggests a plausible motivation for the force and vitriol Mr. Cosby alleges he suffered. In other words, Plaintiff's complaint tells a "story that holds together" concerning how his protected speech pushed Defendant Rodriguez and other officers to harm him.

Rodriguez cites two cases to support the opposite view, but neither is helpful to him. In one, officers shot the plaintiff (who was protesting the construction of an oil pipeline) with lead-filled bean bags, badly injuring him, when he "ignored a countdown warning" and refused to comply with their order that he and other protesters disperse from a bridge they had occupied illegally. *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022). The plaintiff had "announced in [the] Lakota [language] that 'water is life' shortly before the officers shot him," but the court noted that other officers began shooting beanbags at protesters refusing to move before this incident occurred, and no other details hinted at any retaliatory motive. *Id.* Here, unlike *Mitchell*, Mr. Cosby's complaint alleges specific details betraying officers' animus, including the widespread use of pejorative language toward both Mr. Cosby ("fuck you") and other protesters. (*See* SAC ¶¶ 46, 85–86 (detailing the language and angry responses of officers).) In the other case Rodriguez cites, the court dismissed a retaliation claim brought by a BLM protester who was

28

injured by police.  The court there distinguished the plaintiff protestor's claim from those involving BLM protests in other cities, in which the police had allegedly used broadly unconstitutional tactics against peaceful protesters and made jokes or otherwise behaved inappropriately.  In those cases, the court concluded, the circumstances suggested that protected activity was motivating some of the behavior.  *Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 665 (N.D. Cal. 2022). This is the type of conduct that Mr. Cosby alleges occurred in May 2020 in Chicago.  (*See* SAC ¶¶ 20, 85.)

Accordingly, Defendant Rodriguez's motion to dismiss Count II is denied insofar as it alleges retaliatory use of excessive force, and granted insofar as it alleges retaliatory arrest.

### D.    Equal Protection Claims

Next, in a one-paragraph section of his brief, Defendant Rodriguez argues that Count III (Equal Protection) of Plaintiff's complaint must be dismissed because the Fourteenth Amendment is the wrong vehicle for such a claim.[11]  (Rodriguez MTD at 14.)  He cites to two district court decisions for the argument that false-arrest or malicious-prosecution claims cannot be brought under the Fourteenth Amendment's Due Process Clause.  (*See id.* (citing *Zhang v. Schuster*, No. 18 C 3283, 2022 WL 615015, at *21 (N.D. Ill. Mar. 2, 2022); *Cruz v. City of Chicago*, No. 20 C 250, 2021 WL 2645558 (N.D. Ill. June 28, 2021)).)

But Count III is neither brought under the Due Process Clause nor, as discussed above in Section I(B)(2), predicated solely on false arrest or malicious prosecution.  Plaintiff points this out, noting that "neither Count pleads a due process claim" and that "Plaintiff does not allege a claim based on wrongful pretrial detention."  (Pl.'s Rodriguez Resp. at 15.)  Plaintiff argues that Defendant's brief and incorrect argument, in addition to being "puzzling and difficult to comprehend," also "waive[s] any [more appropriate] argument for dismissal of those claims."  (*Id.*)  And in his reply brief, Defendant Rodriguez claims that he "merely seeks to dismiss Plaintiff's

---

[11]    Rodriguez asks the court to dismiss Count VI on the same grounds; as noted above, the court has already dismissed that count and thus focuses only on Count III here.

claims to the extent he seeks to recover for his pretrial detention under the 14th Amendment . . . ." (Rodriguez Reply at 11.)

A violation of the Fourteenth Amendment's Equal Protection Clause could be predicated on a use of force "motivated by a discriminatory purpose." *Lux v. City of Whitewater*, 631 F. Supp. 3d 647, 667 (E.D. Wis. 2022) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)). Because Defendant has not addressed that theory, the court declines to dismiss Count III.

### E. Conspiracy Claims

Rodriguez also seeks to dismiss Plaintiff's three conspiracy claims—Counts IV, VII, XV— because "none of Plaintiff's underlying claims are viable against Officer Rodriguez," the conspiracy claims also fail, "as they rely entirely on deficient claims." (Rodriguez MTD at 15.) In other words, the sole basis on which Rodriguez asks the court to dismiss Plaintiff's conspiracy counts is that Plaintiff's claims of an underlying constitutional violation are not viable. Rodriguez is correct that a plaintiff alleging civil conspiracy must "'show an underlying constitutional violation' and 'demonstrate that the defendants agreed to inflict the constitutional harm.'" *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Hurt v. Wise*, 880 F.3d 831, 842 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019)). As explained earlier, however, the court concludes that Mr. Cosby has alleged plausible underlying constitutional violations against Officer Rodriguez. His premise that the complaint relies "entirely on deficient claims" is incorrect, and the court declines to dismiss Counts IV, VII, or XV.

### F. Count X

Finally, the court notes that, while Defendant Rodriguez sought dismissal of the entirety of Mr. Cosby's Second Amended Complaint (*see* Rodriguez MTD at 1), his briefs make no mention of Count X, which alleges violations of the Illinois Constitution. This Count, too, survives the motion to dismiss. *See Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013) ("It is not the

district court's job to flesh out every single argument not clearly made."); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[C]onclusory analysis will be construed as waiver").

### G. Conclusion

For the reasons discussed above, Counts V, VI, XIII, and XIV of Mr. Cosby's complaint are dismissed with prejudice; the other Counts implicating Defendant Rodriguez (Counts I–IV, VII, VIII, X, XI, XII, and XV) are dismissed without prejudice to the extent they rest on a claim of unlawful arrest, but otherwise remain live, with respect to Defendant Rodriguez.

## II. Claims Against Superintendent Brown

The court now turns to whether Plaintiff's allegations about Superintendent Brown and the City plausibly state a claim for relief. The City Defendants seek to dismiss Plaintiff's failure-to-intervene claim—Count VIII—as alleged against Superintendent Brown in his individual capacity. (*See* City MTD at 2.) For the reasons discussed below, the court agrees with the City and dismisses Count VIII without prejudice.

### A. Failure to Intervene

An officer can be held liable for failure to intervene when he "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). Importantly though, "[l]iability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). The requirement for such a "direct" connection requires courts to carefully scrutinize whether a failure-to-intervene defendant had a "realistic opportunity" to intervene. Multiple courts in this district, for example, have concluded that "[p]olice officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts." *Moore v. City of Chicago*, 209 F. Supp. 3d 1016, 1033 (N.D. Ill. 2016); *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 942 (N.D. Ill. 2014) (same). The Seventh Circuit has suggested that "a

'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned [the officer meting out excessive force] to stop.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285).

Even when extending a failure-to-intervene claim to cover officers who were not physically "present," courts hold that the defendant must have directly and personally acquiesced in the specific unconstitutional act (or actor) at issue. In *Smith v. Burge*, for example, the court allowed a failure-to-intervene claim against supervisors who knew (but turned a blind eye to the fact) that a specific officer—Officer Jon Burge—was repeatedly torturing and coercing confessions from suspects. 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016). Similarly, in *Baker v. City of Chicago*, the court refused to dismiss a failure-to-intervene claim where the plaintiff alleged that supervisors "knew about a pattern of . . . misconduct by [specific] Defendant Officers yet deliberately allowed *those officers* to continue their abuses . . . ." 483 F. Supp. 3d 543, 559 (N.D. Ill. 2020) (emphasis added).

Plaintiff's complaint makes no allegation that Superintendent Brown knew either that Officer Rodriguez was using force that day against Mr. Cosby, or that Officer Rodriguez had a habit of using excessive force against protesters, and that Brown knew of this or turned a blind eye to it. Instead, Cosby alleges that Superintendent Brown was "aware of the widespread practices of CPD officers using excessive force," that he "maintained and encouraged those practices at the summer 2020 protests, and that he took no action to halt the officer's [sic] systemic use of violence against protesters." (Pl.'s Resp. to Defs. City of Chicago and Superintendent Brown's Combined Mot. to Dismiss in Part Pl.'s Second Am. Compl. ("hereinafter "Pl.'s City Resp.") [58] at 15 (citing SAC ¶ 36).) The court assumes the truth of these allegations, as it must, but concludes they sketch out a theory of liability at the protest-wide level rather than locating liability specifically in Brown's relation with Officer Rodriguez. Under the standards described above, these allegations are insufficient; there is no allegation that Superintendent Brown was present on May 30th, nor that he witnessed or knew about the harm Rodriguez allegedly inflicted

on Plaintiff, nor that he had any realistic opportunity to intervene and prevent the specific use of force alleged here.  Cosby's allegations read as a theory of vicarious liability, not individual liability; Brown's supervisory efforts may have been inadequate, but without more, Cosby's allegations are insufficient to state a § 1983 claim.  The court dismisses Count VIII with respect to Defendant Brown.

## III.  *Monell* Claim Against the City

Under § 1983, a municipality or other local governmental entity may not be held liable for an officer's unconstitutional acts "*solely . . . on a respondeat superior* theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978) (emphasis in original).  Instead, a municipality may be liable under § 1983 "when execution of a government's policy or custom . . . inflicts the injury" the plaintiff suffered.  *Id.* at 694.  *Monell* liability extends to any "official policy, widespread custom, or action by an official with policy-making authority" that "was the 'moving force' behind his constitutional injury."  *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris,* 489 U.S. 378, 379, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989)).  There is no "heightened pleading standard" for *Monell* claims.  *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016).

Plaintiff Cosby alleges two primary theories of *Monell* liability against the City of Chicago. First, he alleges that the City (and Superintendent Brown) were "deliberately indifferent to the widespread unconstitutional practices within CPD that caused Plaintiff's injuries."  (Pl.'s City Reply at 12.)  Second, he argues that Superintendent Brown, as a "final policymaker" for the city, "authorized and directed the officers' unlawful conduct at the summer 2020 protests."[12]  (*Id.*)  For

---

[12]     In addition to alleging a theory of *Monell* liability predicated on Superintendent Brown's actions as a policymaker, Plaintiff names Superintendent Brown in his official capacity, alongside the City, as a second *Monell* defendant.  As the City Defendants note (City Reply at 7–8; *see also* SAC ¶ 132), this is redundant.  Suit against the police superintendent "in his official capacity only . . . is the equivalent of suing the city."  *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (citing *Brandon v. Holt,* 469 U.S. 464, 471–73, 105 S. Ct. 873, 83 L.Ed.2d 878 (1985);

the reasons discussed below, the court sustains Plaintiff's claim with respect to the former theory, but not the latter.

### A.    Deliberate Indifference

In the absence of an explicit unlawful policy, a city may be liable for a widespread custom, such as when a plaintiff "show[s] a series of bad acts and invit[es] the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). A plaintiff must thus allege "a general pattern of repeated behavior" as opposed to "a mere isolated event." *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006). And though no "bright-line rules defin[e] a 'widespread custom,'" the Seventh Circuit has stressed that "one instance is, or in some cases even three instances are, insufficient to 'demonstrate that there is a policy at issue rather than a random event.'" *Carmona v. City of Chicago*, No. 15-CV-00462, 2018 WL 1468995, at *2 (N.D. Ill. Mar. 26, 2018) (quoting *Thomas v. Cook Cnty. Sheriff's Office*, 604 F.3d 293, 303 (7th Cir. 2010)). Rather, to hold a municipality liable for a constitutional injury, a plaintiff typically must present evidence "that the identified practice or custom caused multiple injuries" over time. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). Moreover, a municipality's "continued adherence to an approach that [municipal employees] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 386 (7th Cir. 2017) (Sykes, J., dissenting) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407–08, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).

---

*Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S. Ct. 3099, 87 L.Ed.2d 114 (1985)). In other words, his addition makes no difference to Plaintiff's *Monell* claim.

Mr. Cosby alleges that CPD has engaged in numerous, widespread "*de facto* policies, practices, and customs" that caused his injury. (SAC ¶ 134.) Among them, Cosby alleges widespread use of excessive force against protesters, including "batons . . . punching, kicking, kneeing, and stomping"; the use of "lethal force against protesters, including but not limited to striking protesters on the head and neck with batons"; retaliation against protesters who "speak out against police violence"; escalatory or animus-infused behavior like "taunts, slurs, pushes, shoves"; "[f]ailing to hold officers accountable who violate protesters' rights"; [f]ailing to train officers on how to appropriately respond to protesters"; and maintaining "the code of silence in the CPD . . . ." (*Id.*)

Then, Mr. Cosby's complaint alleges numerous instances of these behaviors, both before and during 2020, which together plausibly establish "a prior pattern of similar constitutional violations" to those he suffered. *Fields v. City of Chicago*, 981 F.3d 534, 562 (7th Cir. 2020). For one, the Second Amended Complaint discusses CPD customs on display before the protest at which Mr. Cosby was injured. Cosby alleges that CPD employed excessive or retaliatory force against protesters well prior to 2020: In 2003, when CPD officers "storm[ed] into the crowd [of protesters] and str[uck] people with batons"; in 2011, when CPD officers battered numerous protesters and hit "legal observers in the face"; and in 2016, when CPD officers "push[ed] protesters with batons, physically attack[ed] protesters," beat at least one protester "on her head and body" with batons, and "attacked and falsely arrested a member of the press." (SAC ¶ 57.) He also points to the DOJ's 2017 Report, which concluded that CPD suffered from—and tolerated—a pattern or practice of excessive force and escalatory behavior toward nonviolent civilians. (SAC ¶¶ 64–66.) Additionally, the Second Amended Complaint notes that the DOJ Report faulted CPD for its "failure to discipline Chicago police officers who engage in misconduct" (*id.* ¶ 78), and pointed out that in October of 2020, Superintendent Brown himself acknowledged that CPD suffered from a culture of silence and failures to hold officers accountable for misdeeds (*id.* ¶ 38).

Further, the Second Amended Complaint alleges widespread use of excessive and retaliatory force over the course of the 2020 BLM protests implicated in this case. Cosby points to the *Chicago Reader* report, which documented more than eighty instances in which officers beat protesters with batons, "[n]early all" of which appeared to violate CPD policy. (*Id.* ¶ 22.) He points to the OIG Report, which observed officers' widespread use of batons against peaceful protesters, as well as frequent punching, kicking, and their use of slurs or other vulgar language toward protesters. (*Id.* ¶ 85.) And he points to the IMT Protest Report, which found "many examples of officers communicating disrespectfully and using force," including baton strikes, punches, dragging a protester, and escalating encounters with slurs and the like. (*Id.* ¶ 86.) The Second Amended Complaint thus paints a picture of a widespread practice of specific forms of police abuse of protesters from 2003 onward—including excessive force using batons, other escalatory behavior—which Mr. Cosby alleges played out widely during the 2020 protest, injuring both him and other protesters.

Plaintiff Cosby's Second Amended Complaint thus plausibly states that CPD officers customarily engaged in practices similar to those Cosby alleges they inflicted on him at the 2020 protests. The Second Amended Complaint's allegations go well beyond "mere isolated event[s]" and state the existence of "general pattern[s] of repeated behavior" that could be construed, in the light most favorable to Plaintiff, as municipal customs. *Davis*, 452 F.3d at 694; *see also Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018) (noting that Plaintiff stated *Monell* claim because "his own . . . excessive force injury" was "sufficiently similar" to those he described in numerous reports on CPD, including the 2017 DOJ report). Moreover, the fact that numerous internal and external investigations and reports repeatedly pointed out these failures plausibly implies that the City was "aware of the risk created by the custom[s] or practice[s] and . . . fail[ed] to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303; *see also Fix v. City of Chicago*, Nos. 21-cv-2843, 21-cv-2846, 2022 WL 93503,

at *3 (N.D. Ill. Jan. 10, 2022) (noting that "based on [plaintiffs'] allegations of the unlawful widespread" use of excessive force, the complaint plausibly implied that the city was on notice).

Finally, Plaintiff plausibly alleges that these customs—and the City's deliberate indifference in the face of those customs—were a "moving force" behind his injury. *Dixon*, 819 F.3d at 348. It is reasonable to infer from his Second Amended Complaint that the City's repeated failure to hold officers accountable for the use of excessive force—including through a culture of silence—emboldened officers to harm Mr. Cosby; indeed, the Second Amended Complaint specifically alleges that a code of silence results in officers' feeling "they can abuse and violate the rights of individuals without consequence." (SAC ¶ 79.) And Cosby's own injuries are alleged to result from excessive force and retaliatory animus toward protestors, the unlawful practices he has alleged. *See Iqbal*, 556 U.S. at 679 (noting that whether a complaint states a claim "requires the reviewing court to draw on its judicial experience and common sense").

Nor does the existence of the Consent Decree require dismissal of Plaintiff's *Monell* claim. Emphasizing Plaintiff's allegations concerning that Decree, the City urges that those allegations themselves "demonstrate that there are express policies in place that prohibit the very conduct he alleges caused his injuries, and that the City has been anything but deliberately indifferent to the alleged constitutional violations." (City MTD at 7–8.) The Consent Decree is a "binding contract" that "directly contradict[s]" Plaintiff's claims that abusive police tactics are official policy of the City, Defendants contend. (*Id.* at 8.) The law is clear, however, that *Monell* liability may be predicated not only on official or written policies but also on "implicit polic[ies] or a gap in expressed policies," or "'a series of violations [that confirm] the premise of deliberate indifference.'" *Thomas*, 604 F.3d at 303 (quoting *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003)). Valuable as it is, the Consent Decree does not defeat a finding that the CPD in fact engaged in other policies or widespread practices in connection with the BLM protests. *See, e.g.*, *Fix,* 2022 WL 93503, at *3 (maintaining *Monell* claim predicated on allegations of CPD's use of force during the BLM protests in 2020, after the Consent Decree was in place).

The bulk of the Defendants' argument on this score is that the City's "ongoing efforts to implement the terms of the Consent Decree demonstrate that it is not deliberately indifferent to Plaintiff's constitutional rights . . . ." (City Reply at 10; *see also* City MTD at 8–11 (same).) In support, the City asserts that it has "dedicated tens of millions of dollars, countless hours, and vast resources to work towards implementing the Consent Decree to improve police practices in Chicago." (City Reply at 10.) As a preliminary matter, this argument goes beyond the four corners of Plaintiff's complaint; the complaint makes no mention of how much money or time the City has spent combating the alleged code of silence or the use of excessive and retaliatory force at protests. *See Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 315–16 (7th Cir. 2020) (noting that a district court cannot consider materials outside the pleadings without converting the motion to a motion for summary judgment).

The sources the City does cite on this issue do not satisfy the court that the Consent Decree's existence requires dismissal of Plaintiff's *Monell* claim. For example, the City points to language from the IMT Protest Report, referenced in Plaintiff's complaint, stating that "'[o]ver the course of the summer [of 2020], the City and the CPD made significant efforts to improve their planning and preparation for protests—planned and unplanned—and unrest.'" (*Id.* (citing IMT Protest Report at 112).) But the City ignores the IMT's very next sentence, which explains that "this planning continued to be largely reactive, as policies, training, and tracking continued to present issues as the City and the CPD responded to events." (IMT Protest Report at 112.) The Plaintiff's allegations concern a protest early that summer, before any subsequent reform efforts would have borne fruit. The question is whether Plaintiff has plausibly alleged that the City was deliberately indifferent up to the point of his injury.

The cases the City cites also do not bear on the adequacy of Mr. Cosby's complaint. The City cites *Taylor v. City of Chicago*, a 2021 case where, in dismissing a plaintiff's *Monell* claim stemming from use of force during an arrest, the court declined to credit the 2017 DOJ Report or any IMT Reports. No. 21 CV 2197, 2021 WL 4523203, at *3 (N.D. Ill. Oct. 4, 2021). The plaintiff

in that case had not cited to either report in his complaint, and unlike here, the plaintiff's complaint did not tie the practices outlined in those reports to his specific injuries. *See id.* at *2–3 (noting that "[g]overnment reports can buttress a *Monell* claim," but that "[plaintiff's] problem is that these reports appear nowhere in his actual complaint" and that "[w]ithout anything in the complaint to suggest that the practices found by DOJ investigators were still in place two years later, the report is a non sequitur"). The City also cites a case in which a court dismissed a plaintiff's *Monell* claim predicated on a false arrest, largely because the report on which the plaintiff relied—produced "pursuant to a settlement agreement between CPD and the American Civil Liberties Union of Illinois" preceding the Consent Decree—described a custom of illegal *Terry* stops, not false arrests. *Anderson v. Allen*, No. 1:19-CV-02311, 2020 WL 5891406, at *3–4 (N.D. Ill. Oct. 5, 2020). The opinion also noted that even if *Terry* stops were relevant to his claim, the same report the plaintiff cited in his complaint also described a precipitous *decline* in *Terry* stops after the settlement agreement, suggesting that the City was not deliberately indifferent to that alleged custom or practice. *Id.* at *4 n.2. As Plaintiff Cosby points out, the allegations in his Second Amended Complaint differ; he has alleged, relying in part on multiple news and investigative reports, that unlawful CPD customs continued to be widespread during the protests in which Cosby engaged, rather than dwindling or declining before his injury. (Pl.'s City Resp. at 8–9.) *Anderson* thus does not support dismissal of Mr. Cosby's claim.

Finally, the City points to a Fifth Circuit case in which the court noted that the city of New Orleans' having "entered into a Consent Decree" was "hardly consistent with demonstrating 'deliberate indifference' on the City's part." *Gomez v. Galman*, 18 F.4th 769, 779 (5th Cir. 2021). Indeed, the City of Chicago's voluntary agreement to a Consent Decree is inconsistent with a finding that police abuse is a matter of policy, but Plaintiff here argues that in the face of that Decree, the City continued to fail to bring an end to certain of CPD officers' unlawful practices. The *Gomez* court itself observed that "[o]f course, for other claims and in other contexts, the DOJ report and Consent Degree [sic] may be useful evidence; but on these facts they are not." *Id.*

The court noted that the portion of an Independent Monitor report on which the *Gomez* plaintiff relied "gesture[d] broadly to issues [the city] ha[d] with hiring and retention," but those broad findings "d[id] not discuss specific conduct of officers like what is alleged here." *Id.* at 779. The Second Amended Complaint in this case is not subject to this criticism; it references repeated, specific unconstitutional practices—striking protesters in the head and neck with batons, escalating encounters with protesters, etc.—and ties them directly to Cosby's harm.

As alleged in the Second Amended Complaint, the Consent Decree and its concomitant IMT Reports gave the City reason to be on notice of the unlawful practices relevant to Cosby's claims, but the City failed to take measures effective to end officers' widespread unconstitutional behaviors at the protests. The Complaint surveys multiple IMT Reports (from 2019 onward) finding that the City had failed to adopt adequate policies in accordance with the Consent Decree, including standards regarding use of force, the use of escalatory behavior, and accountability mechanisms. (*See* SAC ¶¶ 72–73, 80–82.) Moreover, Mr. Cosby alleges that the City dragged its feet, "[i]n terms of use of force, . . . miss[ing] 16 out of 19 deadlines, and fail[ing] even preliminary compliance for 19 out of 25 Consent Decree paragraphs," and "not achiev[ing] secondary or full compliance in any paragraphs concerning use of force." (SAC ¶ 73.) The court is aware that the City's alleged failure to comply fully with particular deadlines or to achieve compliance with particular paragraphs is not inconsistent with genuine efforts to achieve reform. Nevertheless, drawing inferences in Mr. Cosby's favor (as the court must at this stage), the City's failure to change its policies in time for the 2020 protests tells a "story that holds together" about its deliberate indifference to the means of unconstitutional policing Mr. Cosby alleges he suffered. *Roldan*, 52 F.4th at 339; *see also Thomas*, 604 F.3d at 303 ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable.").

The court makes no findings on these issues. But Cosby has plausibly alleged that the City's deliberate indifference to widespread unlawful practices on the part of its officers resulted in his injuries. These allegations are sufficient to support a claim for *Monell* liability.

**B.     Actions by Superintendent Brown as Policymaker**

Plaintiff's separate theory of *Monell* liability—that Superintendent Brown, as a final policy maker for the City, directed and authorized unlawful conduct—requires only brief discussion. (Pl.'s City Resp. at 12.) As the City points out, Plaintiff relies mostly on conclusory allegations in support of this theory. (*See* City MTD at 15; City Reply at 8–10.) For example, Plaintiff alleges that Brown "made all command decisions about the Chicago Police Department's systemic response to protesters during the 2020 uprisings . . . ." (SAC ¶ 36.) According to Mr. Cosby, that included his encouragement and permission to CPD officers to "target, attack, and harass" those protesting, and that he was "physically present" for one—Mr. Cosby does not specify which— protest during which he did not intervene to stop officers' violent behavior. (*Id.*) The Second Amended Complaint also alleges that, in the months following the protests, Brown defended officers in various ways. (*Id.* ¶ 37.) Nowhere in these allegations can the court find more than "bare assertions" concerning Brown's implementing a specific policy directly traceable to Mr. Cosby's harm. *Iqbal*, 556 U.S. at 681. The court thus agrees with the City that Plaintiff has not plausibly pleaded this latter theory of *Monell* liability.[13]

<u>**CONCLUSION**</u>

For the foregoing reasons, the court grants Defendant Rodriguez's motion [37] with respect to Counts V, VI, XIII, and XIV of Cosby's complaint. Defendant Rodriguez's motion to dismiss the remaining counts against him is granted to the extent they rest on an alleged false arrest, but is otherwise denied. Defendant Brown and the City's motion to dismiss [39] is granted

---

[13]     Superintendent Brown's behaviors around the time of the protests—as may surface during discovery—may be relevant to Plaintiff's (surviving) deliberate-indifference theory of *Monell* liability. To the extent facts uncovered in discovery support the policymaker *Monell* theory, Plaintiff may seek the court's leave to amend.

with respect to all claims against Brown and otherwise denied.  Defendants are directed to file answers to those claims that survive this motion within 28 days.


ENTER:


Dated:  January 16, 2024

REBECCA R. PALLMEYER
United States District Judge